IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

MARY SUE RITTER,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

    Defendant.

No. C13-2015

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.    INTRODUCTION ............................................. 2

II.   PROCEDURAL BACKGROUND .............................. 2

III.  PRINCIPLES OF REVIEW .................................... 3

IV.  FACTS ........................................................ 5
    A.   Ritter's Education and Employment Background ............... 5
    B.   Administrative Hearing Testimony ........................... 5
        1.   Ritter's Testimony ................................... 5
        2.   Vocational Expert's Testimony ....................... 7
        3.   Ritter's Medical History ............................. 8

V.    CONCLUSIONS OF LAW ..................................... 10
    A.   ALJ's Disability Determination ............................ 10
    B.   Objections Raised By Claimant ............................ 12

VI.  CONCLUSION ............................................... 18

VII. ORDER ...................................................... 18

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 2) filed by Plaintiff Mary Sue Ritter on February 8, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Ritter asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Ritter requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On December 14, 2009, Ritter applied for disability insurance benefits. In her application, Ritter alleged an inability to work since November 29, 2009 due to anxiety, depression, arm tendinitis, and fibromyalgia. Ritter's application was denied on April 7, 2010. On August 2, 2010, her application was denied on reconsideration. On August 13, 2010, Ritter requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 17, 2011, Ritter appeared via video conference before ALJ Jo Ann L. Draper for an administrative hearing.[2] Ritter and vocational expert Julie A. Svec testified at the hearing. In a decision dated December 14, 2011, the ALJ denied Ritter's claim. The ALJ determined that Ritter was not entitled to disability insurance benefits because she was functionally capable of performing her past relevant work as a meat cutter, cashier, and child monitor. Ritter appealed the ALJ's decision. On December 12, 2012, the Appeals Council denied Ritter's request for review. Consequently, the ALJ's December 14, 2011 decision was adopted as the Commissioner's final decision.

On February 8, 2013, Ritter filed this action for judicial review. The Commissioner filed an Answer on April 17, 2013. On May 20, 2013, Ritter filed a brief

---

[2] At the administrative hearing, Ritter was not represented by an attorney; but instead, had a non-attorney representative, Maureen Nowak.

arguing that there is no substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing her past relevant work as a meat cutter, cashier, or child monitor. On July 12, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On May 20, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision

3

"extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Ritter's Education and Employment Background

Ritter was born in 1955. She completed the eleventh grade. Later, she earned her GED. At the administrative hearing, Ritter's representative questioned Ritter about her academic abilities:

> Q: Okay. If you have to read something and understand what it says, do have any difficulty with that?
> A: Yes, I do.
> Q: And is that a problem that you've had long term or is it a newer problem?
> A: Mainly since I've started with the meds and the fibromyalgia.
> Q: So what type of problem do have with that?
> A: I don't always comprehend, so I have to reread and then I forget what I've read.

(Administrative Record at 32.)

The record contains a detailed earnings report for Ritter. The report covers the time period of 1970 to 2010. Prior to 1979, Ritter had minimal earnings (less than $700). From 1979 to 2009, Ritter earned between $207.61 (1981) and $16,792.60 (1988). She has no earnings since 2010.

### B. Administrative Hearing Testimony

#### 1. Ritter's Testimony

At the administrative hearing, Ritter's representative asked Ritter what medical problems she has that make her believe she is incapable of working. Ritter responded that "[t]he depression and anxiety is a big deal because I sometimes have trouble getting out into where people are. I feel intimidated I guess and it's very hard to meet face-to-face with people sometimes. I can't stand on my feet for very long and I can't sit for very long

5

without being very uncomfortable."[3] Ritter also stated that difficulties associated with fibromyalgia and arthritis limit her ability to work. Ritter further noted that side effects from her medications also make working difficult. Specifically, Ritter testified that her medications cause her to be confused at times and make her "very, very tired."[4]

Next, Ritter's representative asked Ritter to specifically discuss her difficulties with fibromyalgia. Ritter explained that she has constant pain in muscle groups all over her body, including her neck, back, calves, knees, and wrists. She stated that on good days her pain is a dull ache, but on bad days her pain is sharp and burning like a bee sting. According to Ritter, she suffers from the sharp/stinging pain "at least" three days per week. The ALJ and Ritter had the following colloquy regarding her sharp/stinging pain:

> Q: What are you able to do on a day that's like that?
> A: Not much.
> Q: What do you do?
> A: I can lay back in the recliner and watch TV and I get up and walk. I don't do much. The meds kind of, you know -- I'm pretty well groggy. I don't do much at all. . . .
> Q: On one of those days that you don't feel well, would you go out of the house?
> A: No, no, absolutely not.
> Q: And why?
> A: Because I'm concentrating on the pain a lot I think. It hurts to -- it hurts to get up and move around. It hurts to bump anything. And it takes so much. I think the pain just consumes your body, your thoughts, every part of your body and I'd be afraid if I went somewhere, I wouldn't concentrate. I wouldn't be able to know where I was going I guess, maybe, you know, a lot. But it's just very painful on those days.

(Administrative Record at 39.)

---

[3] Administrative Record at 36-37.

[4] *Id.* at 38.

Ritter's representative also questioned Ritter about her functional capabilities:

> Q: What do you think is the maximum weight you could lift and carry around the house on a daily basis?
> A: Five pounds maybe, [for] a short period of time. . . .
> Q: Okay. Now sitting in a chair like you are now, how long can you normally sit there before you'd have to get up and move around?
> A: Not very long. . . .
> Q: If you had to stand, let's just say like you were doing your cashier job before, how long could you stand before you'd have to change positions?
> A: I could stand -- like now if I were washing dishes, I could stand for 10 to 15 minutes, the length of time it takes to wash some dishes and then I would have to sit down and take a little break before I could finish.
> Q: How long would that break be before you could go back and do something?
> A: Usually about a half hour at least.

(Administrative Record at 40-41.) Ritter also stated that she could walk about one city block before needing to rest. Additionally, Ritter noted that she suffers from weakness and numbness in her hands.

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Julie A. Svec with a hypothetical for an individual who is:

> exertionally limited to no more than light work activity, lifting and carrying 20 pounds occasionally, 10 pounds frequently. This individual could stand and walk no more than six hours a day, sit no more than six hours a day. This individual could only occasionally climb, balance, stoop, kneel, crouch, crawl. This individual would be limited, actually precluded from performing work at a production rate pace.

(Administrative Record at 56.) The vocational expert testified that under such limitations, Ritter could perform her past relevant work as a meat cutter, cashier, or child monitor. The ALJ asked the vocational expert a second hypothetical that was identical to the first

hypothetical except that the "individual would be limited in the ability to handle no more than occasionally bilaterally[.]"[5] The vocational expert testified that under such a limitation, Ritter would be precluded from competitive employment.

Ritter's representative also questioned the vocational expert:

> Q: If we added to hypothetical one, that the person would work at a slower pace a third of the day due to pain or concentration problems, would that affect any of the jobs that you listed?
> A: It would. With that none of the jobs would be possible.
> Q: One other limitation, if that person due to the pain or due to the depression or anxiety would miss three or more days a month, would that affect the jobs that were listed?
> A: It would. Again, they would not be possible.

(Administrative Record at 48.)

### 3. Ritter's Medical History

In September 2009, Ritter met with Rod Schreck, MSW, LISW, for her annual psychosocial update. Schreck noted that over the past year Ritter had been receiving outpatient mental health services to treat a history of depressive symptoms. Upon examination, Schreck diagnosed Ritter with major depressive disorder, recurrent and in partial remission and generalized anxiety disorder. Schreck opined that Ritter "can be a pleasant woman with work related skills. She has stable family relationships, housing and income. [She] has been willing to engage in outpatient mental health services."[6] Schreck recommended that Ritter continue receiving psychiatric medication reviews with Dr. Douglas Jones, M.D., and utilize therapy services as needed.

In November 2009, Ritter met with Dr. George B. Isaac, M.D., complaining of pain in her arms, shoulders, knees, and legs. Specifically, Ritter reported that the pain

---

[5] Administrative Record at 57.

[6] Administrative Record at 258.

began two months prior to her appointment consisting of "sharp" pain. She stated that "any activity" increased her pain, and rated the pain at 10 on a scale of 1 to 10 with 10 being the most pain. Upon examination, Dr. Isaac diagnosed Ritter with fibromyalgia, joint pain, and depressive disorder. Dr. Isaac recommended medication as treatment.

On February 11, 2010, Dr. Rene Staudacher, D.O., reviewed Ritter's medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Ritter. Dr. Staudacher determined that Ritter could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Staudacher further determined that Ritter could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. Dr. Staudacher found no manipulative, visual, communicative, or environmental limitations.

On April 7, 2010, Dr. David A. Christiansen, Ph.D., reviewed Ritter's medical records and provided DDS with a Psychiatric Review Technique assessment for Ritter. Dr. Christiansen diagnosed Ritter with depressive disorder and anxiety disorder. Dr. Christiansen determined that Ritter had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Christiansen concluded that Ritter's "impairments are reasonably well controlled with medications and are not seen as severe."[7]

In September 2011, Ritter met with Dr. Isaac complaining of generalized pain. Ritter also specifically pointed out pain in her knees and legs. Upon examination, Dr. Isaac found that an:

---

[7] Administrative Record at 337.

9

> MRI of the neck didn't show any significant findings to suggest any nerve pinch or anything which means her pain is mostly muscular. Her knee examination is unremarkable which means that her pain probably is related to her generalized pain syndrome, Fibromyalgia, and there is not much we could do[.]

(Administrative Record at 455.) Dr. Isaac recommended that Ritter continue her medications as treatment.

## V. CONCLUSIONS OF LAW

### A. *ALJ's Disability Determination*

The ALJ determined that Ritter is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Ritter had not engaged in substantial gainful activity since November 29, 2009. At the second step, the ALJ concluded from the medical evidence that Ritter had the following severe

impairments: fibromyalgia, depression, anxiety with panic attacks, arthritis in the spine and knees, and history of alcohol abuse. At the third step, the ALJ found that Ritter did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Ritter's RFC as follows:

> [Ritter] has the residual functional capacity to perform light work . . . except she could occasionally climb, balance, stoop, kneel, crouch, and crawl. [Ritter] would be precluded from performing work at a production rate pace.

(Administrative Record at 13.) Also at the fourth step, the ALJ determined that Ritter was functionally capable of performing her past relevant work as a meat cutter, cashier, and child monitor. Therefore, the ALJ concluded that Ritter was not disabled.

### B. Objections Raised By Claimant

Ritter argues that the ALJ failed to properly consider her subjective allegations of pain and disability. Furthermore, Ritter argues that the ALJ's RFC determination is flawed because of the ALJ's failure to properly consider her subjective allegations. Ritter concludes that this matter should be remanded for an award of benefits; or in the alternative, remanded for further consideration of her subjective allegations.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical

evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

Furthermore, when an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant

number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

In her decision, the ALJ generally determined that:

> After careful consideration of the evidence, I find that [Ritter's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Ritter's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Administrative Record at 14.) More specifically, the ALJ found that:

> Overall, the objective medical evidence does not support [Ritter's] allegations of disabling pain and limitations. For example, on January 4, 2011, Dr. Isaac, noted that [Ritter] had some discomfort on range of motion in the lumbar spine, but otherwise there is no evidence of any radiculopathy. He also noted mild arthritis. . . . A physical examination on January 12, 2011, showed some tenderness of the lumbar spine, but straight leg raises were negative and she had 5/5 motor strength. In April 2011, [Ritter] also reported numbness and tingling in both hands and weakened grip due to osteoarthritis. However, she stated that the symptoms were

14

not that bad and the numbness and tingling were not present all the time. . . . While [Ritter] clearly has some pain associated with fibromyalgia, osteoarthritis, and muscle pain, the objective medical evidence does not demonstrate impairments that could be considered totally disabling.

[Ritter] has not generally received the type of medical treatment for pain one would expect for a totally disabled individual. [Ritter] has utilized numerous treatment modalities for pain, including physical therapy, chiropractic care, and prescription pain medications. Although [Ritter] has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature. [Ritter] has also been prescribed and has taken appropriate medications for the alleged impairments, which weighs in [her] favor, but the medical records reveal that the medications have been relatively effective in controlling [her] symptoms after several adjustments. In addition to pain medications, doctors recommended that [Ritter] attend physical therapy in June 2010. [Ritter] only attended three sessions of physical therapy. This is despite the fact that her doctor noted that physical therapy treatments usually take 9 to 12 sessions before significant failure or success can be determined. In July 2010, doctors offered [Ritter] a referral to pain management, which she refused. Doctors also requested additional diagnostic testing at that time to help determine the etiology of her pain, which [she] also refused. Such a delay, or putting off the opportunity to seek answers to an impairment with such a difficult etiology may indicate that [Ritter's] symptoms may not be as serious as alleged in connection with this application and appeal. . . . Given the paucity of objective medical evidence and conservative treatment, I cannot find [Ritter's] allegations of total disability fully credible.

[Ritter's] activities of daily living are also inconsistent with her allegations of disability. . . . [Ritter] reported that she performs light housework, runs errands, goes to doctors appointments, cooks one meal per day, watches television, and exercises on a treadmill for 15 minutes several times per week. [She] also reported she has no difficulties with personal care,

shops for groceries once per week, goes outside daily, and can drive [a] car. Overall, [Ritter's] descriptions of her daily activities are essentially normal. Her activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitation that preclude her from work activities. Although [she] may not be able to engage in all of the activities that she did in the past and it may take her longer to perform the tasks, she is more active than would be expected if all of her allegations were credible. . . .

Overall, the record reveals that [Ritter's] allegedly disabling impairments were present at approximately the same level of severity prior to the alleged onset date. The fact that the impairments did not prevent [Ritter] from working at that time strongly suggests that it would not currently prevent work. Furthermore, there is some evidence that [Ritter] continued to work after the alleged onset date. Treatment notes dated September 21, 2011, noted [Ritter] was acting as a babysitter for two little boys. Although it appears that work activity did not constitute disqualifying substantial gainful activity, it does indicate that [Ritter] has been able to perform some work for pay.

After considering the evidence of record, I find that [Ritter's] medically determinable impairments could reasonably be expected to produce the alleged symptoms but [Ritter's] statements concerning the intensity, persistence and limiting effects of these symptoms is not fully credible to the extent they are inconsistent with the residual functional capacity assessment. . . . Overall, I find the record as a whole does not support the level of pain and limitations alleged by [Ritter].

(Administrative Record at 14-16.) The ALJ also considered Ritter's credibility with regard to her mental impairments:

In absence of temporary situational factors, [Ritter's] treatment records fail to demonstrate disabling symptoms and limitations. . . . In light of [Ritter's] mental health treatment records showing significant improvement, I cannot find her allegations of disabling mental limitations fully credible.

16

> Despite [Ritter's] allegations of disabling mental impairments, the records show that she engages in a rather active lifestyle. For example, in June 2011, [Ritter] reportedly participated in a 5K for suicide awareness. Treatment notes dated September 26, 2011, noted that [Ritter] enjoys going on 'club rides' and she was planning to go on an overnight ride between Minnesota and Wisconsin. Although these activities and a disability are not mutually exclusive, [Ritter's] ability to engage in these activities suggests that the alleged symptoms and limitations may have been overstated.

(Administrative Record at 17-18.)

It is clear from the ALJ's decision that she thoroughly considered and discussed Ritter's treatment history, medical history, functional restrictions, medication use, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Ritter's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Ritter's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

Furthermore, having reviewed the entire record, the Court finds that the ALJ properly considered Ritter's medical records, observations of treating physicians, and

Ritter's own description of her limitations in making his RFC assessment for Ritter.[8] *See Lacroix*, 465 F.3d at 887. Specifically, the ALJ concluded that "[t]his residual functional capacity is based on the entire medical record and adjusted to give [Ritter] the benefit of the doubt with regard to her allegations of disability."[9] Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (providing that an ALJ also has a duty to develop the record fully and fairly). Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Ritter's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

## VI. CONCLUSION

The Court finds that the ALJ properly determined Ritter's credibility with regard to her subjective allegations of pain and disability. The Court also finds that the ALJ properly considered the medical evidence as a whole, including Ritter's subjective allegations of disability, in making a proper RFC determination based on a fully and fairly developed record. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 2) is **DISMISSED** with prejudice; and

---

[8] *See* Administrative Record at 14-19 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

[9] Administrative Record at 19; *see also id.* at 16 and 18 (providing a discussion of adjustments by the ALJ to Ritter's RFC assessment based on some of her impairments and allegations of disability).

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this 28th day of October, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA